Jeff Garfinkel for Ronald Tutor and Zelus. Your Honor, appellants, on what I think is the third matter. Right. And so Tutor and Zelus were hearing, but the companion case was submitted on the briefs. Yeah. Well, I mean, and I'll address it in a minute. I'm going to have three minutes for rebuttal. Thank you, Your Honor. Jeff Garfinkel, Buckhalter Niemer, appearing on behalf of Appellant Zelus and Ronald Tutor. We have joined in our briefing with Mr. Bergstein on the jurisdictional issues. So I will be addressing those as well with the court's permission. I think the court has before it an interesting issue of bankruptcy jurisdiction as well as bankruptcy procedure involving a non-debtor subsidiary. Pangea was not in bankruptcy, has never been in bankruptcy. Yet the bankruptcy court decided to remove Mr. Bergstein as its manager. It wasn't an asset of this day of R2-D2, which was in bankruptcy. The membership interest in Pangea was the asset, but the bankruptcy court did not have jurisdiction over the internal affairs of Pangea. Right. It didn't say it did. But it did more than that when it removed, when it authorized the removal in its order. I mean, once it gave the trustee the permission to vote his shares, maybe he could have done the rest of what he did anyway, right? Perhaps, Your Honor, but that would be an issue for another court that has competent jurisdiction. I'm sorry, I don't understand that. Well, listen, the bankruptcy court has pretty broad equitable powers. They're constrained. And their job is to preserve the estate. And so you had a big problem here. If I may address that, Your Honor, when we look to 1334, Title 28, the bankruptcy court has jurisdiction over matters arising in, arising under, or related to the bankruptcy case. Well, this would be related to the bankruptcy case. So the membership interest, and there's a very lot clear in my mind. Why is it called a membership interest rather than an ownership interest? That's the technical term under Delaware corporate law. It's a membership interest in a limited liability company. That's the term that the Delaware corporate code uses. Can I ask you what your client's interest is or was in Pangea? We are the largest or one of the largest creditors of Pangea. Creditor of Pangea. And we're also, because of – Are you creditors of R2-D2 as well? Yes. We're in both situations. As the declaration of Mr. Tudor explained, he personally guaranteed a loan which Pangea obtained from Business First Bank to the tune of $2.5 million. So when he had to honor that guarantee, when Pangea defaulted on its loan to Business First Bank related to the father of invention loan, Mr. Tudor acquired that loan, essentially subjugated to the position of the prior lender, which coupled with another $7.5 million loan, third-party loan, had $10 million of liability against Pangea. So the question that needed to be asked, and I'm moving on to the business judgment test, is did Pangea have the prospect of having more than $10 million of assets, which could then be upstreamed to the parent company R2-D2? And there was never any attempt at any point in time to make that showing by the trustee. At every turn, he didn't ask the very fundamental questions, what are the assets of Pangea? And the reason that matters is because if Pangea had no possible assets, then there was no benefit to the estate. That's right. This debtor had, in the records for flexes, had 65 subsidiaries. But why isn't that something best determined in a bankruptcy? It would have been had the bankruptcy court done, required the analysis. One of the cases that ---- I'm not understanding that. I'm saying if you have a ---- here you have somebody with a ---- to me it's an ownership interest in the subsidiary who is faced with a subsidiary in dire financial straits. And his business judgment is the way we're going to figure out what to do with a apparently insolvent company is the way one usually does, i.e., put it in bankruptcy and see what we can get out of it, if anything. That's not ---- But the fact that you ---- to say that you have to prove first that there isn't anything seems a strange rule. No, it's not, Your Honor. Because what we asked of trustees, and this is reflected in the code and the U.S. trustee guidelines, that trustees are not to administer assets that will not realize benefit to the unsecured creditors in a bankruptcy case. That's the fundamental analysis. But what you had here was a situation where the trustee was being lied to, i.e., he didn't ---- he was told there wasn't an asset and he wasn't ---- I mean, he got to the point where he, as I understand it, the only way he was going to find out what was the actual condition of this company and what it could pay or couldn't pay was to take it over and bring it into a bankruptcy and have everything exposed at that point. I mean, I guess that's the business judgment. There's no other way to do this, given the fact that people are not giving me a straight story. That is, with all due respect, Your Honor, not the record. The record reflects that in the summer of 2010, the trustee was handed by me a copy of the operating agreement for Pangea. That operating agreement is attached to the record. Let me ask you this. This trustee was an expert at ferreting out fraud, right? He is a certified ---- They got him, huh? So you tell us, you know, we know, we understand the situation. Now, how is he going to get in there and ferret all this out and go through all these little other subsidiaries unless he's got the power to do it? How's he going to do it? Easy, Your Honor. Tell me, please. When I represent a trustee who has multiple subsidiaries, the first and fundamental question that's asked is, what are its business purpose, what are its assets, and what are its liabilities? And from there, you make the business judgment as to whether you want to administer that subsidiary. He never asked that question. You're talking about the trustee. Yes, the trustee does that. But the trustee is looking at what is believed to be massive fraud, right? That's why they brought him in. That's his expertise, you know, and so he's got to act and he's got to move. And you ever heard of a case called equity funding? Absolutely, Your Honor. You know who the judge was on that?  Who was he? You, Your Honor. Say it louder, would you? And what law firm was he representing? And the law firm was Melvin and Meyers. And your law firm was involved in it, too. And great lawyers there. I know them all. And I don't remember you. You were probably in. I was at another firm. I was at a firm that's now bankrupt. I called it Brobeck, Flager, and Harrison. They were early in my career. You were at Brobeck. I was at Brobeck for many years, Your Honor, for 13 years. Oh, yeah. 13 years. You know Richard Haas? Yes. He was my classmate at law school. But let me. In the Naval Army. So the real question here is whether this is simply not in the usual paradigm given the background of the difficulty of finding anything out here when you're being lied to for quite a while. I would respectfully disagree with you, Your Honor. The record reflects that there was a declaration submitted of Mr. Reyes, a very detailed declaration that went through all of what Pangea U.K. was, what Pangea U.S. was. But when was that? That was after a period in which there was denial that this thing even existed. Or that R2-D2 owned it. Right. And that Bergstein had anything to do with it. But there was also this crazy thing that at one point it was alluded to as being a very successful, insolvent company, and all of a sudden when it came out that it had some relationship to R2-D2, all of a sudden it was insolvent. And so how else is anyone going to – I mean, even the bankruptcy court, when it made its ruling, said he still felt there was something else out there. He was still suspicious. I mean, how are you going to get to the bottom of what this actually is and how insolvent is the company unless you examine it? Well, and here's what should have happened in my view, and I think the law supports this. First of all, the very first meeting with the trustee, Bergstein should have told them the full truth, right? I don't know if that's the case, Your Honor. I have the whiteboard sketch. I even brought it with me today. He listed Pangea on this board. I wasn't there. I don't know what was said. I don't know what was in the mind of the people there. He didn't list all of the 65 subsidiaries of this debtor. It was a rough sketch on a whiteboard, and that's in the record and it's reflected in that. I know what the trustee has said about that, and there is a contention that it was concealed. I – the record also reflects that in June of 2010, in response to a 2004 exam against Pangea, I handed the trustee a copy of the operating agreement for Pangea. So it was never concealed after that point. It's been in the trustee's possession. But the operating agreement is not – doesn't tell you its financial situation. You're right, Your Honor. And that – the reason why that was never provided, because it was just never asked for. And had the bankruptcy court conducted the evidentiary hearing that took place in the – I think it's the McDonald case where they had a two-day evidentiary hearing over whether this should be administered. Could I ask you – this may be an extremely naive question, but I mean, that's why you're here today. Tell me things I don't know. What is – I mean, it was asked before what your client's interest is. But specifically, what is your client's interest? If this company is in the bad shape that you say it is, then it seems to me that you should welcome the bankruptcy as a way to administer the creditor's interest so that people – so that they're being administered fairly. So what is your client's interest? Again, let me repeat. In the declaration that was submitted to the bankruptcy court, because that's the record that the court has before it, Mr. Tudor explained, I've guaranteed this $2.5 million loan that's secured by a Kevin Spacey film for which all the film rights have not yet been sold off. I am subject to a secured claim, the lender, Business First Bank. And if it goes to the trustee, then those rights will not be marketed and sold in the way I need them to do of my personal responsibility. Trustees are told by the U.S. trustee not to administer fully encumbered assets. And so there's no dispute that the first father of invention film is fully encumbered by the first – the Business First Bank loan. And so the concern of my client was, look, you're going to cause me more financial harm and economic analysis if you put Pangea into bankruptcy. That was supported by the other creditors who also are Pangea. Now, the bankruptcy court said it's in the interest of Pangea to remove Bergstein as its manager and place into bankruptcy. Well, I mean, you could do one of those things and not the others. I mean, it doesn't seem at this point to be in anybody's interest to have Bergstein there. We disagree, but that was what we told the bankruptcy court. He was doing the marketing and sales at no cost, no charge, and we were happy with that prospect. And we weren't very pleased with having the prospect of a trustee who's trying to upstream money to R2-D2. His goal is not to protect the rights of the creditors of Pangea. His goal as the owner of R2-D2 – But your argument is that there was no money to upstream. But he's going to – And that had to be shown in advance when there was money to upstream. If you're going to administer a subsidiary, a non-debtor subsidiary of a bankrupt company – But now what you're really saying is whether there was money to upstream depends whether it was in bankruptcy and therefore the creditor's rights or the creditor's interests would be handled differently than they would be if it weren't in bankruptcy. So therefore, the question of whether there were in fact more than $10 million in assets depends on – Or whether anything would end up in the R2-D2 estate depends essentially on whether it was in bankruptcy or not. No. That seems to me what you're saying. In other words, either you have no problem because you're going to be treated the same way in a bankruptcy and there's not going to be any money left for R2-D2, or you have a problem precisely because if it goes into a bankruptcy, the creditors will be treated differently and there will be some money that will go to R2-D2. That's what you said the second time. No. We're saying that we expect the loss, Mr. Tudor, will incur will be increased by virtual bankruptcy filing. That's our expectation, what will happen. Because he will not honor the secured creditor's rights in the same fashion in order to get money for R2-D2. That's one problem. I know. So therefore, if he would get money for R2-D2, then he has a legitimate business interest in doing this. But let me turn to the other problem that's also the jurisdictional issue. Am I wrong about the fact that you have an internally contradictory argument? I don't think so, Your Honor. I don't think – I respectfully disagree. I think our papers point out why in the declaration Mr. Tudor explains it. And I see my time is up and I want to stay tied for rebuttal. But I'm happy. Yeah. Okay. Thank you. Now, I need to advise you this. We have – Judge Bea is going to be down here in about five minutes. And he is – we're going to reconstitute this panel to hear this one case. I'm a case from that case because it involves a partner in my brother's law firm. So – We have to finish this. Yeah, we have to finish this one first. Why don't you – why don't you call Judge Bea and tell him to wait? Well, I don't – you know, he's a terror. I don't want to tell him that. I would basically tell him another half hour. Okay. Well, you want to call Judge Bea and see if he's got a problem. Okay. Otherwise, it would be too confusing. Yes, please. Okay. Because he may have other plans. He's accommodating us. All right. Yes. Should I proceed? Yes, please. May it please the Court, Leonard Gumport for Ronald L. Durkin, the bankruptcy trustee of R2 – You're not related to Emil Gumport. I wish that I was. I'm not 100 percent sure that I'm not. But I'm not aware of any connection other than a similarity in the last name. Well, he had an E. And I have an O. You have an O. So what – I did think there was a glaring failure in your brief. Marcia. What? Emil Gumport was a saint, you know, And he was president of the – was the American Bar and the California State Bar. And he – after he retired, he came back to work pro bono. He worked in that court until the end. And he was always – I was just starting out over there. I was probably 40 years old. And he embraced me and he led me in the right direction. So thanks, Emil. Okay, go ahead. I thought there was a glaring failure in your – And the briefs were kind of passing the night because the main argument for Mr. Tudor was the one that he said today, which was that because of the $10 million in secured debt, I gather, there was really nothing that was going to end up benefiting the R2-D2 state and, therefore, that it was not a business judgment decision to go forward with this. And you said nothing about that. There was no response. So what's the response? Your Honor, I think we made three points in our brief. You made no response. You really – the words $10 million were not in that brief. $10 million words were not in the brief. What we said as to – what I'm going to say right now is there were multiple reasons, notwithstanding what Mr. Tudor was saying about the $10 million, as to why the trustee correctly exercised his business judgment to remove Mr. Bergstein as manager and to have authority – Well, if he were – if his premise were right, would there be no – would there be no reason? If his premise were right, there might be no reason except for one. And here's the – here's the responses to that. First, there's no reason to believe that premise is right. Mr. Tudor is one of the people – That's why it would have been nice if you had briefed him. But anyway, go ahead. Okay. Your Honor, I'm – let me come back to that. Okay. But to respond to the point, item number one, there's no reason to believe that that premise is correct. That is, we – the trustee was given different pictures about Pangea and its assets and its connections with R2-D2. As to Pangea, as the Bankruptcy Court pointed out, when R2-D2 was trying to make the involuntary petitioners post a large bond against damages caused by the bankruptcy petition, Pangea was presented as this company that was suffering millions of dollars of damages that should be bonded. And then when the trustee came in to say, well, I want to exercise control over Pangea, we get to the hearing on November 30th, 2011, in front of Judge Russell. And Judge Russell is told it only – this company only has one asset. That's it. That's this Kevin Spacey movie. And Judge Russell said to counsel who's just spoken, how does that square with statements that were previously made to me? And the answer was, I'm aware of those statements. I can't explain it. And one of the things that the trustee put in evidence was this catalog, Pangea Media Group catalog, with hundreds of motions of pictures in it. And at the same time, Judge Russell is being told there's no motion pictures in this company. So the earlier statements about the value of Pangea and its assets, was that made to you by Bergstein? Is that where the earlier statements came from? That was made by R2D2, represented by Bergstein's counsel. Okay. Okay. And the timeline is we first meet with Bergstein, this is all in the record, in April 2010. He doesn't even disclose that Pangea is owned by R2D2. In fact, he draws a chart that affirmatively misrepresents that R2D2 has any connection with Pangea. He then provides a tax return with a list of subsidiaries. The subsidiaries don't include Pangea. Then when he wants to get a bond posted by the involuntary petitioners in an effort to make them drop the involuntary petition, he comes into court and says Pangea is suffering millions of dollars of damages. That's in the July, October 2010 period. The bankruptcy judge doesn't order the bond. And after that, Bergstein goes back to filing bankruptcy schedules in May of 2011 and July of 2011 that don't list that R2D2 owns any interest in Pangea. So it's Pangea has this kind of shifting relationship, and it has to be put in context of Mr. Bergstein is designated by the Bankruptcy Court under Rule 9001-5. That designation requires that Mr. Bergstein cooperate in the administration of the estate. So when someone says, and the rule that requires that is Rule 4002a-4, and Your Honor, I think maybe you have a question for me. Now, go ahead. Okay. And that rule requires that the designated person cooperate in the administration of the estate. So your basic response to the business judgment is basically the one that we were floating before, and that is there was no way to believe anybody about anything at this point unless you take the place over. I mean, is that essentially it? Your Honor, A, yes. B, there's one additional advantage. One of the things that is said is that you should have served a Rule 2004 subpoena to get these records, and the record reflects there were multiple Rule 2004 orders requiring Pangea records. And as we pointed out, and as Judge Russell pointed out, if Mr. Durkin became the control person, then under applicable law, recognized in bankruptcy cases such as this, the trustee can waive the attorney-client privilege of Pangea and get records where Mr. Garfinkel previously had been saying that they're privileged. We can't give them to you. You're not entitled to these. And if we serve the subpoena, we just get a response back saying, well, Pangea asserts the attorney-client privilege. That's why Mr. Bergstein has to be removed, because bankruptcy, particularly in bankruptcy where this is recognized, the new control person can get access to otherwise attorney-client privilege information. The other question is, does this order – I mean, why did this order need to do anything? It doesn't matter that it did anything beyond allowing the trustee to vote the shares and remove Mr. Bergstein. The order, Your Honor, that was – Just vote the shares. I mean, once he voted the shares, he voted the shares. And why does anything else go through the bankruptcy court? Your Honor, to use property out of the ordinary course of business – and there is a case saying voting an ownership interest in a corporation is exercising rights of property of the estate out of the ordinary course of business – requires court approval, and the trustee is at risk if he doesn't get a court order. He can be sued. I understand he needed the court order to vote it, but did he need a court order to say how he voted it or what he did? The answer to that is found in Volume 3 of Mr. Tudor's excerpts of record, which came in with a reply brief, where you will see his threat to sue the trustee and his professionals, even if they act pursuant to court order, to put Pangea into bankruptcy. So the short answer was, we could have simply said, could we just have permission   That's what I'm asking. But the less permission you have from the bankruptcy court, the greater your exposure is when you do things that the bankruptcy court hasn't specifically authorized. But the counterargument is that the bankruptcy court didn't have authority to go beyond the authorization of the vote. And the response to that argument, Your Honor, is the only thing that the bankruptcy court was doing was giving the trustee authority to vote stock, that membership interest that belonged to R2-D2. Now, I understand. That's why I'm asking you. But you're essentially saying we wanted further, more cover than that. Yes, Your Honor. We wanted the district court, the bankruptcy court, to not only say what we would vote, that we would vote it, but how we would vote it. Yes, Your Honor. And the bankruptcy judge at the hearing said, I understand needing cover from litigation. And the question is, what is the authority for the bankruptcy judge to do that? Okay. And that is, 363B, the bankruptcy court can authorize you to use property out of the ordinary course of business, and adopting resolutions by voting membership interest is using property of the estate out of the ordinary course of business. That doesn't really, it still doesn't answer my question. Yes. In terms of what level, of getting into the details of how, what they're doing, rather than that they're doing it. Well, the ---- I mean, the answer may be it's all a nullity. You didn't get any cover. But I suppose that's to be seen down the line. It may just be a nothing, the rest of it. Well, it may or may not be, but we hope that that's not the case. And certainly when trustees get authority to sell something, for example, which is another use of property out of the ordinary course of business, they don't just go into court and say, Your Honor, could I sell this? What they do is they say, can I sell this to Joe, subject to overbid by Fred, on an as-is, where-is basis, with his closing date to happen on this date. And by analogy here, we didn't just go in and say, can we have authority to vote this membership interest. We went and said, can we have authority to vote this membership interest to do these things, particularly where the people opposing it have ---- are on record, they're going to sue us. So I don't think it's just a nullity. Your Honor, where ---- But is it also the case that the people that ---- I mean, who was responsible for kind of getting Pangea put aside and overlooked and not part of the original ---- brought into the bankruptcy original? Your Honor, the ---- How did you find out about Pangea? The way we found out about Pangea is in approximately August, October 2010, after we'd been in the case for about six months, and Mr. Bergstein wanted to bolster his argument that the involuntary Petitioners should post a large bond. Had to post a bond. He said Pangea is a subsidiary of R2-D2 and it's suffering damages and they need to bond those damages. It wasn't until it was in his interest to closely connect Pangea with R2-D2 that he disclosed that fact. Let me take one step back from that and say, I invite the Court's ---- It was sort of a fraud, wasn't it? It was a fraud, Your Honor. But it wasn't a fraud. That's why you brought the new trustee in there, to get in to all of this. And they didn't know about all these subsidiaries. Yes, Your Honor. And it seems to me that there's ---- was there any emergency? Was something that was a mess? Was there a need felt that you just got to take control of this now before more things pop up and there are greater problems or assets are being hidden or what? Yes, Your Honor. Mr. Bergstein, because of his designation, had a duty to cooperate with the trustee. He didn't, and the evidence says he didn't provide a financial statement concerning Pangea. He didn't provide tax returns for Pangea. He let Pangea get suspended by Delaware. And he's the manager. The Pangea operating agreement says there's supposed to be tax documents prepared. Necessary filings are supposed to happen under the manager. And what we know is we have a manager who gave us a fraudulent chart hiding this asset entirely from us. There was the fear that since Pangea was wholly owned by R2D2 and its assets should be part of the bankruptcy estate, and if you didn't act, that more of whatever assets Pangea had would slip away? Is that part of the ---- That and the second one is Pangea has records. They have been withheld based on a claim of privilege. That privilege can't be exercised once Mr. Bergstein is out of there. And I want to emphasize one last thing as my seconds tick away on this, which is Exhibit 26 to our moving papers when we went in to get control of Pangea. Exhibit 26 was the June 10, 2010 opposition by Mr. Garfinkel to a ruled 2004 motion for records of Pangea. And the response was, and I'm reading from Exhibit 26 at page 2 where the SER site is SER 0257. The response to the request for the articles of organization operating agreements of Pangea from Mr. Garfinkel were, Request 3 and 4 seek operating information for third parties. These agreements could not possibly have anything to do with the alleged debtors' current assets. This statement was made by the gentleman who ultimately produced the Pangea operating agreement, showing exactly the opposite, that Pangea belonged to R2D2. Could I ask what the current situation is? The current situation is we've been threatened. We have not been moved on it. No. And what is the current situation with Pangea? Is it a bankruptcy? Is it a bankruptcy proceeding? It's not a bankruptcy. No, no, no. We are waiting for this Court to issue its decision because we've been told we're going to be sued the second we try to do something. And they're taking their appeal. So this is we're waiting for this Court's. But was the order stayed? No, the order was not stayed. You just haven't moved on it. We just have not moved on it. We have not moved on it because we've been told we will be sued. And an order authorizing the use of property under 363 of the Bankruptcy Code does not become statutorily moot under 363M, unlike a sale order. On a sale order, the appeal becomes moot. On uses of property, 363M doesn't make it moot. So we could do stuff, get sued, and your honors, you know, two years after this all came up, could say, oh, this was a great big mistake, and then Mr. Dirk and I are sitting there at the wrong end of a lawsuit by Mr. Tudor, and we don't want to be there. So basically it's been how many years now that this hasn't happened? The case was – Life is moving on, meanwhile, in terms of whatever Jay's assets are. Oh, yes. The bankruptcy case started in 2010. Has Bergstein been removed, meanwhile? No, he has not been removed. Nothing's happened. He's not – well, a lot has happened in the bankruptcy case, a lot of litigation. He has not been removed, nor have privileged documents been turned over. So do you know what the worth is of Pangea and all the subsidiaries? We know – we don't know the value. What we know is Pangea seems to be ectoplasm. It's something where there's assets there sometimes and assets there not sometimes. It's exactly the kind of thing a bankruptcy trustee should be dealing with because there were assets there once, and they're not there now. And it is insolvent, as Mr. Garfinkel said in writing, before we asked for permission to do this. That's exactly the situation you would have a bankruptcy. But you don't know whether there's any worth left in the assets. Well, I would not say I know. I know that I have to find out, that it is prudent to find out. But to the extent any assets were transferred during the pendency of all this, you would have the power to unwind. There would be an unwinding power both on fraudulent transfer claims and on breach of fiduciary duty claims. The fact that they've taken the assets out doesn't mean they can't be recovered. One of the big things that happens in a bankruptcy case is companies are stripped. In fact, one of the arguments made in the think film bankruptcy cases is that hundreds of motion pictures were stripped out before bankruptcy. Would you ‑‑ I mean, is your ultimate position that whether or not, I mean, even if it were to turn out that the R2T0 estate actually gets no value, that there's still ‑‑ that's at the back end, but at the front end there is still a responsibility and an authority to take over this asset because it is, in fact, an asset of the estate. And to vote it and run it. And if it turns out there's nothing there, then there's nothing there. Yes, Your Honor. One of the duties of a bankruptcy trustee, particularly a bankruptcy trustee under Chapter 11 in Section 1106A34, is to investigate and report. And one of the reasons why trustees have the power under CFTC v. Weintraub to waive the attorney client privilege of a debtor in bankruptcy is because, as Justice Marshall said, insider fraud would often not be unearthed unless the trustee had access to the management's records. So your ultimate answer to the $10 million, which I still wish you'd given one of, is that it's sort of irrelevant. Well, it's sort of irrelevant, but I think, as Your Honor also mentioned, liens sometimes get subordinated or disallowed in a bankruptcy case. And since Mr. Tudor's counsel was the one who told us early on in this Exhibit 26 that the operating agreement, Pangea, wasn't something that even reflected in an asset of R2-D2, we don't take Mr. Tudor's word for gospel. Don't take it for gospel. Don't. We don't. That's an interesting expression. Well, I don't know, interesting good or interesting bad, but. No, I mean, no, I just. It's like we don't take it as a gospel truth. Yes. Yes. That's what I meant to say. What did you mean to say? What I meant to say was I don't take what Mr. Tudor says as gospel truth. Or as any truth. Yes, any truth. Some people don't think the gospels are necessarily the truth, so. May I, with the Court's permission, can I give you, may I give you a supplemental citation? Sure. Kind of write it down and give it to the Court. Write it down and give it to the Court. Okay. That's fine. And thank you very much. I don't know what else I can say about fraud. It's not here. I'd like to read to the Court what was said by me to the bankruptcy court. When the Court asked me about what Mr. Bergstein said in terms of the bond motion and the supposed viability of Pangea, I said, I can't explain it. I also said this. I don't know what was in the minds of the people that prepared those documents. I know in our investigation, we never located a single written agreement for which Pangea Media Group, a Delaware limited liability party, is a counterparty. Had we found those agreements, we would have turned them over. In connection with the motion, the trustee sent discovery to Mr. Tudor, asked Mr. Tudor and Zellis to produce all of your documents relating to Pangea. They were turned over without any assertion of privilege. There were no documents showing an ownership in any film libraries. I represented the bankruptcy court that a search of the U.S. Copyright Office reflected that Pangea didn't have an ownership interest in any films other than Father of Invention. What about this catalog? The catalog is, when you open up your Saturday paper, you get a Caldwell Banker title with a big insert. And it had lots of pictures of homes. That doesn't mean that Caldwell Banker has rights in all of those homes or owns them. The same is this catalog. Somebody prepared a marketing material. So the question has to be, is what distribution rights, either contractually written or oral, did Pangea Media Group, LLC, the U.S. entity, have with respect to these films? There were five or six different film libraries owned by different entities. Those are all contractually based, easily traceable. They have been traced. And throughout the bankruptcy court proceedings, the bankruptcy court has acknowledged who owns them. There's no dispute about that. Why couldn't you find them? What do you mean? I could find them. There was no document. They just don't exist. What I told the court is, had we had any agreement. Paul, you're not. I mean, there are two problems, obviously. One of them is temporal, i.e., the fact that they don't own it now doesn't mean they didn't own it yesterday. And the other is the, you know, tree of subentities and how they're related to each other. The fact that they're not in the name of Pangea doesn't mean that they're not in the name of somebody related to Pangea that actually redounds to Pangea in some fashion. Well, the judge considered this in terms of substantive consolidation. There was two motions for substantive consolidation of all these entities, including Pangea U.S., and Judge Russell denied that. He said Pangea was separately separate from the other debtors, that he wasn't going to order substantive consolidation. And that is the law of the case at this point. So in that regard, Judge Russell understands what Pangea is and what it was not. But getting back to Your Honor's question or point, the Bankruptcy Court exceeded its jurisdiction when it crossed that line to get into the internal affairs of Pangea. That was an issue that the Court did not have as a private right, which the Bankruptcy Court did not have jurisdiction. It was beyond the scope of Bankruptcy Court jurisdiction. But you, my understanding is that both you and Mr. Bergstein have been arguing an all-or-nothing proposition. You have been arguing that this order is incorrect in some of its details, but that the basic order, which is to vote the shares, is okay. You're saying that's not okay either. The trustee clearly has the right to use property of the estate and get Bankruptcy Court approval to use it. I want to administer this asset. And I want to vote the shares. How that asset then gets administered is an issue for a court with competent jurisdiction, not the Bankruptcy Court. This Court, in case after case He did not need the authority of the Bankruptcy Court to vote the shares. He needed authority to vote it. But beyond that, whether you could remove Bergstein, whether you could put it into bankruptcy, those are issues for other courts to decide. That's not what I've understood your argument to be. I think it was very clear in Mr. Bergstein's reply papers as to what he tried to argue. I thought it was clear. In other words, did they agree that the order to vote the shares was a valid order? To vote the share, yes. But I also say that he should – let me just say this. To vote the shares, yes, from a constitutional jurisdictional basis, yes. But our argument is it violated the business judgment because the trustee needed to make a showing that there was $10 million in assets. So from a constitutional standpoint, the Bankruptcy Court couldn't cross that line to get into the internal affairs of Pangea. This Court, and I know my time is up and I apologize, this Court, in an analogous situation, has said that the bankruptcy automatic stay does not apply to assets belonging to non-debtors. It's beyond the scope of the Bankruptcy Court's jurisdiction. We only look to what the race is. The race here are the membership interests in R2-D2. Beyond that, those are issues for other courts. And the Bankruptcy Court exceeded its jurisdiction constitutionally. And subject matter jurisdiction went across that line. Kennedy, how did Pangea escape being part of the original? Because, if I may address the Court, I know my time is up, but I think it's an important understanding. Go ahead. There were five involuntary petitions filed by creditors. Yeah. None of the petitioning creditors had a claim against Pangea. The creditors for Pangea, there's four of them, all on the record, all filed oppositions to the trustee's actions. They all oppose what the trustee, they're saying that's not in the interest of Pangea. It may be in the interest of R2-D2, but it's not in the interest of Pangea. And from a corporate law standpoint, when the trustee crosses that line and tries to enhance his recovery as equity, to the detriment of creditors, then he exposes himself to liability. And that's what the trustee's been concerned about, because he would be administering the asset subject to Delaware corporate law. Well, but Pangea was an asset of R2-D2. The membership interest, that's all it was. Just like no different than if the debtor owns shares in Exxon. It only owns the shares of Exxon. It doesn't own what's in Exxon Corporation. So they have that membership interest, and so they have an interest, in a sense, in the assets. And the trustee is seeking to protect that interest, and the bankruptcy judge is, of course, interested in saying that the assets that are in a sense represented by that membership interest are preserved so that the creditors of R2-D2 would get the benefit of that. Is that right? Well, if he had done that analysis, which he didn't do. What? If he had done that analysis, which he never did, unlike the Maldonado case where they had a two-day hearing as to whether that subsidiary had value, the bankruptcy court never conducted that economic analysis. Would anybody ever bring this whole situation to his attention? Absolutely. It's in the declarations that we submitted in opposition. And that was asked for? Yes. You asked for it? Yes. Thank you, Your Honor. It's been a pleasure. Thanks. We're going to take a recess, and then we'll reconstitute the panel.
judges: Pregerson, Wardlaw, Berzon